# In the United States Court of Federal Claims

**No. 10-511C**
**(Filed: October 25, 2010)***
***OPINION ORIGINALLY FILED UNDER SEAL ON OCTOBER 12, 2010**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * **Bid Protest; Brooks Act, 40 U.S.C. §§** |
| **WESTON SOLUTIONS, INC.,** | * **1101-1104 (2006); Objection to** |
| | * **Synopsis Barred Under <u>Blue & Gold</u>** |
| **Plaintiff,** | * <u>**Fleet, L.P. v. United States**</u>**, 492 F.3d** |
| | * **1308 (Fed. Cir. 2007); Unexplained** |
| **v.** | * **Discrepancies in the Record Must be** |
| | * **Clarified by Agency; Partial** |
| **THE UNITED STATES,** | * **Injunction During Remand to Clarify** |
| | * **Ambiguities in the Record and** |
| **Defendant.** | * **Provide a Final Ranking.** |
| | * |
| * * * * * * * * * * * * * * * * * * | * |

*Michael H. Payne,* Philadelphia, PA, for plaintiff.

*Michael Duane Austin,* U.S. Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davison,* Director, for defendant. *Carol Olson*, Army Corps of Engineers, Elmendorf, AK, of counsel

**O P I N I O N**

**FIRESTONE**, *Judge.*

Pending before the court are cross-motions for judgment on the administrative record filed under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") by the plaintiff, Weston Solutions, Inc. ("Weston"), and by the defendant, the United States ("government"), in this bid-protest case.  For the reasons set forth below, the court **GRANTS-IN-PART** the plaintiff's motion for judgment on the administrative record, and **DENIES** the government's motion for judgment on the administrative record.

## I.   STATEMENT OF FACTS

The following facts are taken from the administrative record.

### A. Introduction

On October 7, 2009, the United States Army Corps of Engineers, Alaska District ("COE") issued a synopsis seeking to identify highly qualified Architect-Engineer ("A-E") firms for negotiations for award of up to two contracts for undefined A-E Hazardous Toxic and Radiological Wastes ("HTRW") services.  Administrative Record ("AR") 13.  The synopsis, as amended, states that "more than one contract is anticipated; no more than three (3) contracts will be awarded."  AR 19.  The synopsis also explained that "[t]he first award is anticipated for the 2nd quarter of FY 2010."  Id.  The resulting contract(s) are to be indefinite delivery firm fixed price contract(s) with a contract limit of $12,000,000 over five years.  AR 13.

Interested parties were instructed to submit a "SF 330 listing their qualifications in accordance with the instructions below."  AR 12.  The Form SF 330 is titled "Qualification Statement."  Id.  An agency Architect-Engineer Selection Board ("selection board") would then select firms, based upon demonstrated competence and qualifications, with whom the agency would conduct later negotiations.  Id.  Interested firms were put on notice that the firms would be ranked based upon the announced selection criteria.  AR 14.

Although the synopsis bore the legend "Solicitation No. W911KB10R0003, " the notice stated that no solicitation would be issued.  AR 12.  Additionally, the synopsis stated that it was "not a request for proposal."  Id.  Moreover, the synopsis noted that "no

projects are yet authorized and no funds are presently available," and that "[t]his solicitation does not guarantee work to selected firms."  AR 13.

The synopsis also stated that "[t]he allocation of requirements to each of these contracts will be based on the assessment of best value for the Government . . . ."  Id.  The synopsis then went on to list a variety of factors which would be used to assess best value. Among the factors were specific and unique capabilities; capacity to perform the work; ability to accomplish work in the required time; and available personnel.  Id.  The synopsis further identified the various types of services the selected A-E firm would be required to handle under the rubric of the COE HTRW program.  AR 13-14.  The synopsis then provided a detailed listing of the primary and secondary selection criteria as well as specific submission requirements.  AR 14-19.

The plaintiff submitted its SF330 and related information, along with twelve other candidate firms, and was ultimately ranked fourth (or "first alternate") among the six firms considered to be highly qualified.  AR 1657, 2226.  The COE intends to negotiate for up to three A-E HTRW services contracts, starting with the first-ranked candidate firm and working its way down through the top three candidates.  AR 2226.  As a consequence, the plaintiff is not in line for a contract award unless negotiations are unsuccessful with the top three candidates.  Id.

The plaintiff challenges the COE's decision to rank the plaintiff as fourth in line, or first alternate, to negotiate for the A-E HTRW services described in the synopsis.  Pl.'s Mot. 16.  First, the plaintiff contends that the selection process was flawed because the

COE's advertised selection criteria were not in compliance with federal procurement law because they did not include FAR 36.602-1(a)(5), which looks at "knowledge of the location" as one of the "Primary Selection Criteria." Pl.'s Mot. 16. Second, the plaintiff contends that the selection board relied on unstated evaluation criteria in violation of federal procurement law by allowing candidate firms, including the third ranked firm, to submit more resumes than the number that the COE listed for each staff position in the synopsis. Pl.'s Mot. 18-20. Third, the plaintiff contends that the COE's selection process was not in compliance with federal procurement law because the selection board gave an overall rating, but did not evaluate and compare each announced selection criterion individually using a rating method. Pl.'s Mot. 17-18. Fourth, the plaintiff contends that the selection board failed to provide an explanation for ranking the plaintiff below the third place firm despite apparently assigning the plaintiff a higher rating than that firm, thereby demonstrating that the COE's ranking decision lacked a rational basis. Pl.'s Mot. 16-17. The plaintiff contends that it has been prejudiced, arguing that there was a "substantial chance" that the plaintiff would have been selected for negotiations and ultimately awarded a contract but for these alleged violations of federal procurement regulations. The plaintiff asks this court to enjoin the COE from proceeding with negotiations with the selected candidate firms, to terminate any contracts awarded, and to

enjoin the COE from proceeding with any negotiation that does not include the plaintiff as one of the selected candidates.[1]  Pl.'s Mot. 2.

## B.  The Regulatory Framework

The synopsis was issued pursuant to the Brooks Act, 40 U.S.C. §§ 1101-1104 (2006), as implemented through Federal Acquisition Regulations "FAR" subpart 36.6 (2008).  AR 12.  The Brooks Act mandates, among other things, that an agency will negotiate contracts for A-E services "on the basis of demonstrated competence and qualification for the type of professional services required."  40 U.S.C § 1101 (2006).  The Brooks Act further requires the agency to select in order of preference, at least three firms that the agency considers most highly qualified to provide the services required.  40 U.S.C. § 1103(d) (2006).  Section 1104, titled "Negotiation of Contract," requires the agency to negotiate contracts at a fair and reasonable price to the Government considering the scope, complexity, professional nature, and estimated value of the services to be rendered.  40 U.S.C. § 1104(a) (2006).  Subsection b of that same provision requires that the agency first attempt to negotiate with the most highly ranked firm, and if the agency is unable to reach agreement with the first firm, then the agency shall attempt to negotiate with the next firm,

---

[1] The plaintiff earlier requested a preliminary injunction enjoining the government from proceeding with the performance of any contracts under Solicitation No. W911KB10R0003, pending a final determination on the merits by this court.  Based upon the representations of the government that it had not and would not begin contract negotiations with the top-ranked firms under the solicitation until the court could resolve the case, the court determined that a preliminary injunction was not necessary and denied the motion as moot.  Weston Solutions, Inc. v. United States, No. 10-511C (Fed. Cl. Aug. 4, 2010) (order denying preliminary injunction as moot).

continuing the process until an agreement is reached.  40 U.S.C. § 1104(b) (2006); see also

FAR 36.606 (2008).

FAR subpart 36.6 prescribes policies and procedures applicable to the acquisition

of A-E services.  FAR 36.600 (2008).  FAR 36.601-3(b) reads in full: "[s]ources for

contracts for architect-engineer services shall be selected in accordance with the

procedures in this subpart rather than the solicitation or source selection procedures

prescribed in parts 13, 14 and 15 of this regulation."  FAR 36.601-3(b) (2008).

FAR 36.602-1, titled "Selection Criteria," provides the factors agencies shall use in

evaluating potential A-E contractors, listed as follows:

> (1) Professional qualifications necessary for satisfactory performance of
> required services;
> (2) Specialized experience and technical competence in the type of work
> required, including, where appropriate, experience in energy conservation,
> pollution prevention, waste reduction, and the use of recovered materials;
> (3) Capacity to accomplish the work in the required time;
> (4) Past performance on contracts with Government agencies and private
> industry in terms of cost control, quality of work, and compliance with
> performance schedules;
> (5) Location in the general geographical area of the project and knowledge
> of the locality of the project; provided, that application of this criterion
> leaves an appropriate number of qualified firms, given the nature and size of
> the project; and
> (6) Acceptability under other appropriate evaluation criteria.

FAR 36.602-1(a) (2008).  An agency evaluation board in evaluating an A-E contractor

shall

> [e]valuate the firms in accordance with the criteria in [FAR] 36.602-1 . . . .
> [and] [p]repare a selection report for the agency head . . . recommending, in
> order of preference, at least three firms that are considered to be the most
> highly qualified to perform the required services.  The report shall include a

description of the discussions and evaluation conducted by the board to allow the selection authority to review the considerations upon which the recommendations are based.

FAR 36.602-3(b), (d) (2008).  "The final selection decision shall be a listing, in order of preference, of the firms considered most highly qualified to perform the work."  FAR 36.602-4(b) (2008).

The Corps of Engineers Federal Acquisition Regulation Supplement ("EFARS") provides that Engineering Pamphlet EP 715-1-7, Architect-Engineer Contracting, sets forth the specific guidance the COE will follow in implementing the above rules for award of A-E contracts within the COE.  EFARS 36.601-3 (S-101); U.S. Army Corps of Engineers, EP 715-1-7, Architect-Engineer Contracting (May 22, 2007).  One guiding principle is that the COE should make public announcements for A-E services which "reflect the minimum needs of the Government, not arbitrarily restrict eligible firms, and describe the work required and selection criteria in sufficient detail to facilitate a meaningful selection of the most highly qualified firm."  EP 715-1-7a ¶ 3-1a.  Further, the COE's "A-E selections will be conducted in a fair, rational and consistent manner, in strict accordance with the announced selection criteria, and in compliance with FAR 36.602."  EP 715-1-7a ¶ 3-1c.

Paragraph 3-4, "Public Announcement," details the governing requirements for making the public announcement that leads to the ranking decision and any resulting contract award.  EP 715-1-7a ¶ 3-4.  Specifically applicable to this case, the COE may

issue a synopsis that "has the equivalent effect as a solicitation for other types of contracts." EP 715-1-7 ¶ 3-4b.

Subparagraph 3-4d states, in relevant part, that "[t]he synopsis will describe the specific work required in sufficient detail to facilitate a meaningful selection of the most highly qualified firm." EP 715-1-7 ¶ 3-4d. Moreover, the subparagraph mandates that the relative importance of all selection criteria be clearly stated. Id. The pamphlet restricts the COE from including criteria which are not directly related to project requirements or unnecessarily restrict competition. Id. It then lists specific examples of requirements that might not be directly related, such as "[s]pecifying the minimum number of personnel in a firm" or "[r]estricting firms to a specific geographic area" or "[r]equiring the submission of excessive qualification information." Id.

Subparagraph 3-4f contemplates contact with firms and provides "requests for clarification of a synopsis . . . will be carefully handled to avoid providing any information that would give, or appear to give, an advantage to a firm in submitting their qualifications." EP 715-1-7 ¶ 3-4f.

Subparagraph 3-7a sets forth the regulatory requirements for the use of selection criteria. It reads in full:

> FAR 36.602-1(a) and the Defense PGI 236.602-1(a)(6) specify the general A-E selection criteria. Defense PGI 236.602-1(a)(6) emphasizes that "the primary factor in A-E selection is the determination of the most highly qualified firm," and that the secondary factors should not be given greater significance than technical qualifications and past performance.

EP 715-1-7 ¶ 3-7a.

Subparagraph c specifies how the selection criteria are to be applied.  EP 715-1-7 ¶ 3-7c.  Subsection (1) lists the primary selection criteria that will be applied.  EP 715-1-7 ¶ 3-7c(1).  According to that subsection "[t]he primary criteria are listed in the order of importance which is usually most appropriate, however they may be ordered differently as warranted for specific contracts."  Id.  The pamphlet lists the primary criteria as follows:

> (a)   Specialized Experience and Technical Competence (FAR 36.602-1(a)(2))
> . . . .
> (b)  Professional Qualifications (FAR 36.602-1(a)(1))
> . . . .
> (c)  Past Performance (FAR 36.602-1(a)(4))
> . . . .
> (d)  Capacity (FAR 36.602-1(a)(3))
> . . . .
> (e)  Knowledge of the Locality (FAR 36.602-1(a)(5))

Id.  Subsection 1(b), "Professional Qualifications," states, "[t]his criterion is primarily concerned with the qualifications of the key personnel and not the number of personnel, which is addressed under the capacity criterion."  Subsection (2) concerns the use of secondary selection criteria, including "Geographic Proximity (FAR 36.602-1(a)(5))."  EP 715-1-7 ¶ 3-7c(2)(b).[2]  As written, "[t]he secondary criteria will . . . only be used by a

_____

[2] The pamphlet instructs the COE to "[c]onsider knowledge of the locality separately from geographic proximity, since the latter is a secondary criterion in accordance with Defense PGI 236.602-1(a)(6).  (A firm may not be located close to a project but still be familiar with certain site conditions.)."  EP 715-1-7 ¶ 3-7c(1)(e).  Defense Procedures, Guidance, and Information (PGI) 236.602-1(a)(6) provides:

> The primary factor in A-E selection is the determination of the most highly qualified firm.  Also consider secondary factors such as geographic proximity and equitable distribution of work, but do not attribute greater significance to the secondary factors than to qualifications and past performance.  Do not reject the overall most highly

selection board as a 'tie-breaker' (see paragraph 3-10.e), if necessary, in ranking the most

highly qualified firms." EP 715-1-7 ¶ 3-7c(2).

Subparagraph 3-8d instructs that "[a] board can use any qualitative method, such as

adjectival or color coding, to evaluate and compare the qualifications of the firms relevant

to each selection crition," EP 715-1-7 ¶ 3-8d, noting that "[n]umerical scoring is

prohibited by AFARS 5115.304(b)(2)(iv)."  EP 715-1-7 ¶ 3-8 n.11.

Paragraph 3-10 details the purpose and procedural activities of the selection board.

Subparagraph 3-10c, "Determination of Most Highly Qualified Firms" states in part:

> All members must personally evaluate the SFs 330 of all of the highly
> qualified firms.  The firms that demonstrate higher aggregate qualifications
> relevant to the primary selection criteria are considered to be the most highly
> qualified firms.   Secondary criteria will not be considered prior to the
> interviews in determining which firms are most highly qualified.

EP 715-1-7 ¶ 3-10c.  Paragraph 3-10d mandates that interviews must be held with all of

the most qualified firms as required by FAR 36.602-3(c).  It goes on to require that all of

the interviews use the same method.  Id.  Further, all questions asked must be similar and

based upon the announced selection criteria.  Id.  Finally, the board must:

> by consensus, rank the most highly qualified firms in order of preference
> using the primary selection criteria. If two or more firms are technically
> equal, the secondary criteria will be used as "tie-breakers" and the final
> ranking of firms decided.  Firms  are technically equal when there is no
> meaningful difference in their aggregate qualifications relative to the
> primary criteria.

Id. at ¶ 3-10e.

_____

qualified firm solely in the interest of equitable distribution of contracts.

### C.  The A-E HTRW Services Synopsis Selection Criteria and Submission Requirements

In paragraph 4 of the subject synopsis, the COE listed the selection criteria for firms with which it would engage in negotiations for potential undefined A-E HTRW services.  AR 14-18.  The selection criteria were listed in descending order of importance, meaning the first criterion listed was most important and the last criterion listed was least important.  Four criteria, (A)-(D), were designated as "primary selection criterion," AR 14, and were listed as follows:

> (A)  Minimum requirements for professional qualifications.  AE Firms need to show the organization of the team that will support the HTRW contract as well as the qualifications of the staff on that team.  The same person can meet the experience requirements of more than one position.  The following are experience requirements for various positions on the team:
> . . . .
> (B)  AE firms shall show specialized experience and technical competence in:
> . . . .
> (C)  AE Firms shall show capacity to maintain schedules and accomplish required work in the required time and at the required quality level.
>
> (D)  AE firms shall show past performance on DOD and other contracts with respect to cost control, quality of work, and compliance with schedules.

AR 15-18.  Following the listing of criteria (A)-(D), the synopsis contained a "NOTE" which read, in relevant part, "[c]riteria (E)-(G) are secondary and will only be used as 'tie-breakers' among firms which are rated as technically equal after the interview phase of the selection process."  AR 18.  The synopsis then listed the secondary criteria, again in descending order of importance, as follows:

(E)   AE firms shall show Small Business (SB) and Small Disadvantaged Business (SDB) participation.  Show how SBs and SDBs were utilized in projects.

(F)  AE firms shall show geographic proximity.

(G)   AE firms shall show volume of DoD contract awards over the past 4 years.  Describe nature of work performed for each contract and the dollar amount.

AR 18.

Under Criterion (A), the most important selection criterion, the synopsis went on to provide a listing of "experience requirements for various positions on the team."  AR 15. For each of the fourteen team positions listed, the synopsis provided a position title, a number of staff needed for that position, and a description of the minimum type and amount of experience that staff in that position should possess.  AR 15-17.  Accordingly, in filling out their SF330, a candidate A-E firm would include, under section E, "Resumes of Key Personnel Proposed for this Contract," the resumes for each of its key personnel. See, e.g., AR 107.  For example, responders were required to submit resumes for "four (4) staff with a minimum of 2 years of professional experience."  AR 15.  For management positions, the synopsis also described their management responsibilities.   For example, the Project Manager requirement read as follows:

Project Manager:  Three (3) staff with a minimum of 6 years of professional experience, of which 3 years are specifically related to environmental and HTRW activities.  This person will be responsible for management of one or more task orders issued on the HTRW contract.

AR 15 (emphasis added).

The synopsis did not indicate that candidate firms were limited to a number of resumes equal to the number that the COE listed for each staff position.  See AR 9-20. Candidate firms were instructed in paragraph 5, along with other specific "Submission Requirements," to "provide ONLY 1 copy" of their qualifications.  AR 18.  No mention was made in paragraph 5 of the number of resumes to be submitted.  AR 18-19.

### D.  The Selection Process

On December 9, 2009, Weston, along with twelve other interested firms submitted their SF 330s.  AR Tab 5.  During the evaluation process, the agency determined that six firms, including Weston, were all highly qualified.  AR 1656-65.  As announced in the synopsis, the agency also rank ordered the six highly qualified firms.  AR 1657.  Weston was listed as fourth.  Id.  The Report of the Architect-Engineer Selection Board ("selection board report") explains how the board reached its ranking decision.  AR 1656-65.

On December 21, 2009, the board met to begin evaluations of the thirteen firms that submitted qualification statement forms.  AR 1656.  During the initial meeting the board discussed the adjectival rating system to be used in the evaluation process.  Id. There were four major adjectival ratings ranging from a low of "Unsatisfactory" to "Satisfactory" to "Good" to a high of "Excellent."  Id.  Additionally, the board broke each factor into "three 'subcategories' (-, o, +) to allow for greater discrimination in evaluating the quality of the submittals."  AR 1657.  As part of the evaluation process each board member was required to complete an adjectival rating form.  See, e.g., AR 1692-1703.  Each form contained the definitions of the adjectival rating system and the selection criteria were listed in the same

-13-

descending order as in the synopsis.  Compare AR 1692-1700 with AR 14-18.  The board members were instructed to "clearly describe in writing how the firm did or did not meet the criteria."  See, e.g., AR 1692.  The rating forms also contained the same legend describing the use of the secondary criteria as in the synopsis.  See, e.g., AR 1700.

On April 15, 2010, the board reconvened.  Sometime between the December meeting and the April meeting each board member individually evaluated and rated each firm based on their ability to meet the criteria in the synopsis.  See AR 1692-1857, 1884-2039, 2066-2222. * * * *  Based upon the individual evaluations, "[q]ualitative analysis and consensus discussions were used to evaluate the qualifications and capabilities of each of the thirteen candidate firms."  AR 1657.  From that discussion, the board eliminated seven firms that were not ranked as highly qualified..[3]  Id.

For the remaining six highly qualified firms, including the plaintiff, the board continued the process to rank the firms  Id.  Interview questions generated from each firm's submission were developed.  Id.  For example, [Firm C] was asked to respond to the following question: * * * * AR 1676.  Likewise, Weston was asked to respond to the following question: * * * * AR 1683.

On April 22, 2010, the board members participated in interviews with each of the candidate firms, posing the questions that had been developed on April 15, 2010.  AR 1657.  During the interview for each firm, each board member completed an "A-E

---

[3] The other five highly qualified firms were [Firm A], [Firm B], [Firm C], [Firm E], and [Firm F].  AR 1657.

Selection Interview Worksheet" listing the questions posed and providing space for the

board members to write notes based on a firm's answers.  AR 1666-91, 1858-83, 2040-65.

Following the interviews, "[f]inal consensus was reached through a collective

evaluation of all the information available to the Board."  Id.  At that time, "all of the

information available to the Board" consisted of all of the information initially available to

each board member during the completion of each board member's individual rating

packets as well as the information generated during the interview process with the six most

highly qualified firms.  Ratings for all six highly qualified firms were demarcated on a

score sheet clearly labeled "Final" as follows:

| Board Member | [Member 1] | [Member 2] | [Member 3] |
|---|---|---|---|
| [Firm A] | Excellent + | Excellent + | Excellent + |
| [Firm E] | Good o | Good + | Good o |
| [Firm F] | Good o | Good - | Satisfactory + |
| [Firm B] | Excellent o | Excellent - | Good + |
| [Firm C] | Excellent - | Excellent - | Good + → |
| WESTON | Good + | Excellent - | Excellent - |

AR 1654.  In the "Final" combined ratings, the [Firm C] rating by [Member 3] included an

arrow pointing from the "Good +" column to the "Excellent -" column, a rating action

that, as discussed infra Part II.B.4., was never clarified.[4]  The board then made a final

---

[4] This lack of clarification, as discussed infra Part II.B.4., becomes important in deciding
whether the COE was required to evaluate the "tie-breaker" criteria for [Firm C] and Weston.

consensus ranking of the six most highly qualified firms in descending order for contract

negotiation as follows:

    a. [Firm A]
    b. [Firm B]
    c. [Firm C]
    d.  Weston Solutions
    e. [Firm E]
    f. [Firm F]

AR 1657.

The selection board report contains a narrative section describing the rationale for

each firm's overall consensus ranking.  AR 1657-64.  The narrative section first provides

detailed rationale for elimination of the seven candidate firms not ranked as highly

qualified.  AR 1657-60.  The report then provides detailed rationale for ranking the six

most highly qualified candidate firms.  AR 1660-64.  At the beginning of each highly

qualified firm's narrative, the consensus ranking is listed followed by a description of the

firm's final rating as follows:

| Firm | Description |
|------|-------------|
| [Firm A] | This firm ranked in the upper range of 'Excellent.' |
| [Firm B] | "This firm ranked in the upper range of middle range of 'Good' to the middle range of 'Excellent.'" |
| [Firm C] | "This firm ranked in the middle range of 'Good' to the low range of 'Excellent.'" |
| Weston | This firm ranked in the upper range of 'Good' to the low range of 'Excellent.' |
| [Firm E] | This firm ranked in the middle to upper range of 'Good.' |
| [Firm F] | This firm ranked in the upper range of 'Satisfactory' to the middle range |

| | of 'Good.' |
|---|---|

AR 1660-64.  The apparent discrepancy between the "Final" rating sheet, which had two

board members rating [Firm C] at "Excellent -" and one board member rating [Firm C]

with an arrow from "Good +" to "Excellent -" and the final consensus ranking narration,

which described the final rating as "middle range of 'Good' to the low range of

'Excellent,'" as discussed infra Part II.B.4, adds confusion to the record of the selection

board's ranking decision.

The basis for each ranking was then described, with the rationale broken down for

each of the primary selection criteria. * * * *

On June 24, 2010, the COE sent letters to the thirteen offerors to inform them of its

decision.  AR 2223-35.  In its letters to each of the highly qualified firms, the COE

informed the firms of their relative rankings in relation to the announced plan to award up

to three contracts.  AR 2223-28.  Each highly qualified firm was also informed what they

should expect during the negotiation process as a result of their respective ranking.  Id.

The COE informed Weston that the top three candidates for the award were [Firm A],

[Firm B], and [Firm C].  AR 2226.  The COE also stated, "If three awards are to be made,

but we are unable to finalize negotiations with any of those firms, we will proceed to your

firm as 1st alternate for negotiations."  AR 2226.

Each firm was also informed that it could request a debriefing if desired.  AR 2223-

28.  Several firms, including Weston, requested a debriefing.  See AR Tab 10.  The

agency prepared a written outline of topics to be discussed at the debriefing.  AR 2305.

Following its debriefing, Weston brought this bid protest challenge, alleging a variety of errors with the agency's procurement process.

## II.  DISCUSSION

### A.  Scope and Standard Of Review

The pending motions are brought pursuant to RCFC 52.1, which provides for review based on the administrative record.  Under RCFC 52.1, the court determines whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

In reviewing an agency's procurement decision under RCFC 52.1, the court's role is limited.  Under the governing statute, 28 U.S.C. § 1491(b)(4) (2006), the court applies a standard of review adopted from the Administrative Procedure Act, codified at 5 U.S.C. § 706(2)(A) (2006).  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  This standard of review provides that a reviewing court shall set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. at 1332 n.5.  The Federal Circuit has explained this standard, stating:

> a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa, 238 F.3d at 1332-33) (internal quotation omitted).  The Federal Circuit has further explained that an agency's decision may be arbitrary and capricious where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Ala. Aircraft Indus., Inc. -Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).  The court also considers the record as a whole.  See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951).  In applying this standard, the court must be mindful that it may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious.  Motor Vehicle Mfrs., 463 U.S. at 43; see also Ala. Aircraft, 586 F.3d at 1375; AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009) ("This Court does not sit as a super source selection authority to second guess and re-score offerors' proposals.").

In addition, to prevail in an action such as this, a party must also establish that it has been prejudiced by the agency decision it is challenging.  To show prejudice, a party must demonstrate that "but for the error, it would have had a substantial chance of securing the contract."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

**B.  The COE's Evaluation.**

The plaintiff has several arguments regarding the evaluation process, including arguments regarding the COE's compliance with federal procurement law and the COE's compliance with its own announced selection criteria.  The court looks at each argument separately.

> **1.  The plaintiff has waived its right to challenge the terms of the synopsis and was not prejudiced by the COE's omission of "Knowledge of Locality" as a primary selection criterion.**

First, the plaintiff suggests that the selection process was flawed because the COE's advertised selection criteria were not in compliance with federal procurement law.  Pl.'s Mot. 16.  Specifically, the plaintiff argues that the selection was flawed because the fifth selection criterion listed in FAR 36.602-1(a), relating to firm location and knowledge of project locality,[5] is missing from the primary selection criteria identified in the synopsis and was therefore not considered.  The COE's own internal guidance also identifies "Knowledge of the Locality" as a fifth primary selection criterion that will be applied, provided that application of the criterion leaves an appropriate number of qualified firms.  EP 715-1-7 ¶ 3-7c(1)(e) (citing FAR 36.602-1(a)(5)).  In response, the defendant does not dispute that the COE did not include the criterion.  However, the defendant argues that the synopsis did include "geographic proximity" as a secondary selection criterion in

---

[5] "Agencies shall evaluate each potential contractor in terms of its . . . [l]ocation in the general geographical area of the project and knowledge of the locality of the project; <u>provided, that application of this criterion leaves an appropriate number of qualified firms, given the nature and size of the project</u>."   FAR 36.602-1(a)(5) (emphasis added).

accordance with its agency evaluation protocol.  EP 715-1-7 ¶ 3-7c(2)(e) (listing

"Geographic Proximity" as a secondary selection criterion) (citing FAR 36.602-1(a)(5)).

The defendant argues that COE's internal policy divides FAR 36.602-1(a)(5)'s selection

criteria relating to firm location and knowledge of project locality into two separate

categories of criteria in accordance with Defense PGI 236.602-1(a)(6) (describing

"knowledge" as a primary and "geographic proximity" as a secondary criterion).  See

supra Part I.B. n.2; EP 715-1-7 ¶ 3-7c(1)(e).  Thus, the defendant contends that the

criterion was not completely ignored and is not a problem.

More importantly, however, the defendant argues the omission of the fifth criterion

from the announced primary selection criteria in the synopsis put the plaintiff on notice of

any potential problem and by failing to challenge the synopsis on that basis before the

evaluation, the plaintiff has waived this claim.  In the synopsis, four criteria, (A)-(D), were

designated as "primary selection criterion" and were listed in descending order of

importance.  AR 14-18.  None of those four criteria contained either the firm location or

the knowledge of project locality criteria as required by FAR 36.602-1(a)(5) absent a

finding that application of the criterion will leave an inappropriate number of qualified

firms.  Following the listing of criteria (A)-(D), the synopsis contained a "NOTE" which

read, in relevant part, "[c]riteria (E)-(G) are secondary and will only be used as

'tie-breakers' among firms which are rated as technically equal after the interview phase

of the selection process."  AR 18.

With regard to the plaintiff's suggestion that the COE erred in failing to consider "knowledge of the locality" and "geographic proximity," the court finds that, regardless of whether the COE should have included the fifth criterion in its synopsis, it is clear from the face of the synopsis that the criterion was not identified and would not be considered. By failing to object to the synopsis when it was issued and prior to the evaluation process, the objection has been waived.  Further, even if the objection were not waived, the court finds that the plaintiff has not demonstrated that it has been prejudiced by this omission.

In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007), a plaintiff alleged that the National Park Service failed to apply a potentially influential statute, the Service Contract Act, 41 U.S.C. §§ 351-358, in evaluating contractors' proposals to provide ferry transportation and related services to Alcatraz Island.  The Circuit held that the agency was required to evaluate contractors' proposals only on the basis of the factors set forth in the solicitation.  Id.  The terms of the Park Service's solicitation did not include any requirement that the bidders consider the statute in question.  Id.  The Federal Circuit therefore found that the plaintiff's allegation was properly characterized as a challenge to the solicitation and not the subsequent evaluation. Id.  The Federal Circuit then went on to hold that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  Id.  Because the plaintiff was aware that the Park Service was not applying the Service Contract Act, the

Federal Circuit found that the plaintiff had waived its opportunity to raise the issue prior to the close of the bidding process.  Id.

The court finds that the same reasoning should be applied here to a synopsis governed by the Brooks Act.  The plaintiff's argument here regarding the omission of the FAR 36.602-1(a)(5) criteria from the primary selection criteria may be properly characterized as a challenge to the terms of the synopsis rather than to the evaluation.  As explained in the COE's internal guidance, a synopsis for A-E services "has the equivalent effect as a solicitation for other types of contracts."  EP 715-1-7 ¶ 3-4b.  The plaintiff was aware of the COE's decision not to include the "knowledge" requirements of FAR 36.602-1(a)(5) as primary selection criteria by the terms of the synopsis.  AR 9-20.  The plaintiff was also aware of the COE's decision to include "geographic proximity" as a secondary selection criterion by the terms of the synopsis and from the Engineering Pamphlet EP 715-1-7, Architect-Engineer Contracting.  AR 9-20; EP 715-1-7 ¶ 3-7c(1)(e).  The plaintiff was further put on notice that the secondary criteria might never be evaluated if two firms were not rated as technically equal after the interview phase of the selection process and would not be evaluated prior to that time, if it occurred.  AR 18; EP 715-1-7 ¶ 3-7c(2).  While the COE's decision in the synopsis not to evaluate all of the factors required by FAR 36.602-1(a) as primary selection criteria may have been unsupported and thus inconsistent with the FAR, the plaintiff failed to object to the terms of the synopsis prior to the close of the submission process.  Accordingly, the plaintiff has waived its ability to raise that objection now, after the submissions have all been evaluated under the terms of

the synopsis and the plaintiff finds itself unsatisfied with the COE's ranking decision.  For

this reason, the COE's failure to consider knowledge of the locality as a primary selection

criterion, while potentially wrong, cannot serve as a basis for setting aside the COE's

decision.

The court also finds that even had the plaintiff not waived its ability to raise this

objection, it has not been prejudiced by the COE's decision not to evaluate all of the

criteria required by FAR 36.602-1(a) as primary selection criteria.  It is clear from reading

the narrative rationale for the selection board's final ranking decision that each of the four

highest ranked firms, including the plaintiff, was given credit under Criteria (B) and (C)

for having performed work in and having offices located in Alaska:

| Firm | Narrative |
|------|-----------|
| [Firm A] | "[Firm A] demonstrated a wide range of HTRW experience conducted on sites across the state of Alaska . . . . [Firm A] has a large office in Anchorage and offices around the world . . . ." |
| [Firm B] | "[Firm B] demonstrated a range of HTRW experience conducted on sites across the state of Alaska . . . . [Firm B] has a large office in Anchorage and offices around the world . . . ." |
| [Firm C] | "[Firm C] demonstrated a range of HTRW experience, and much of this work was conducted on sites in Alaska . . . . [Firm C] has a small office in Anchorage and additional offices in the Pacific Northwest.  For the contract, [Firm C] has teamed with [Firm X], and [Firm X] has a large office in Anchorage . . . ." |
| Weston | "Weston demonstrated a range of HTRW experience on sites in Alaska . . . . Weston has an office in Anchorage and additional offices in the US . . . ." |

AR 1660-63.  It is clear that the selection board took knowledge of and proximity to

location into account in its evaluation, even if it did not include them as separate primary

selection criteria.  Despite this evaluation, the plaintiff still ranked fourth.  Thus, the

plaintiff has not demonstrated that it has been prejudiced by the COE's decision not to

include FAR 36.602-1(a)(5) as a primary selection criterion.

**2.  The selection board's acceptance and consideration of more professional resumes for a position did not constitute reliance on an unstated evaluation criterion and did not prejudice the plaintiff.**

The plaintiff's second argument is that it was prejudiced by the COE's evaluation because it gave [Firm C] "credit for additional resumes not required, or requested, in the Synopsis."  Pl's. Mot. 19, 31.  The plaintiff contends that whereas Weston only provided a number of resumes equal to the number of staff listed for each position, [Firm C] elected to provide several additional resumes, apparently in an effort to show the COE that it had a number of qualified staff to fill each position.  The plaintiff argues that COE's acceptance of more resumes than the number of staff listed for each position in the synopsis resulted in an unstated evaluation criterion.  Id. at 33.

In support of this argument, the plaintiff points primarily to the selection board report, in which evaluation of criterion (A) for the plaintiff was identical to that for [Firm C], except for the distinguishing language, "However, only the required number of resumes was submitted for each position."  Compare AR 1661 ¶ 14 with AR 1662 ¶ 10. The plaintiff argues that but for this distinction it would have been tied with [Firm C] prior to the final ranking and that the final three "tie-breaker" criteria would have been evaluated.  The plaintiff contends that if the "tie-breaker" criteria were evaluated, it would have a substantial chance to be ranked third, ahead of [Firm C], and be in a better position to negotiate an A-E HTRW services contract with the COE.

The defendant responds that there was nothing in the synopsis limiting the number of resumes, and, to the extent that the plaintiff was confused as to the terms of the first

criterion, the plaintiff had to raise these objections earlier, prior to the time specified for

receipt and evaluation of the qualification statements under the doctrine of waiver set forth

in Blue & Gold Fleet.  Def.'s Mot. 26.  The defendant also argues that the acceptance of

additional resumes did not prejudice the plaintiff because "the individual board members

all evaluated a firm's submission against the announced selection criteria."  Def.'s Reply

6.

> [T]o prevail on an argument that an agency used an unstated evaluation
> criterion, a protester must show that: (i) "the procuring agency used a
> significantly different basis in evaluating the proposals than was disclosed;
> and (ii) the protester was prejudiced as a result-that it had a substantial
> chance to receive the contract award but for that error."

NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009) (quoting Banknote Corp. of Am.,

Inc. v. United States, 56 Fed. Cl. 377, 387 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)).

The court agrees with the government that the synopsis did not limit the candidate firms

from providing more resumes than the number of staff listed for each position listed under

criterion (A).[6]  The court also agrees with the government that if the synopsis was unclear

with respect to the terms of the evaluation criteria, the plaintiff needed to raise this

objection prior to the evaluation of the candidate firms' qualification statements.  Finally,

upon close examination of the record, the court finds Weston also benefitted from the

---

[6] This case is in contrast to cases where there is a limit.  See, e.g., Techsys Corporation, B-
278904.3, 98-2 CPD ¶ 64 (Comp. Gen. April 13, 1998) (holding that pages beyond the proposal
page limits will not be considered because consideration of an offeror's excess proposal pages
could give that offeror an unfair competitive advantage).

COE's decision not to disqualify candidate firms for submitting excess resumes and cannot now claim that it was prejudiced by that decision.

As discussed, <u>supra</u> Part I.C., criterion (A) provides that "AE Firms need to show the <u>organization of the team that will support the HTRW contract</u> as well as the qualifications of the staff on that team." AR 15 (emphasis added). The synopsis did not indicate that candidate firms were permitted to furnish additional resumes, beyond the number that the COE listed for each staff position, nor did it indicate that candidate firms were limited to a number of resumes equal to the number that the COE listed for each staff position. Candidate firms were instructed in paragraph 5, along with other specific "Submission Requirements" to "provide ONLY 1 copy" of their qualifications. No mention was made in paragraph 5 of the number of resumes to be submitted.

The plaintiff argues, however, that the number of resumes listed for each staff position must be read as a maximum limit on the number of resumes a firm could submit and that the COE could accept and evaluate. The plaintiff warns that the COE's practice of accepting more than the minimum required resumes, if more widely understood, would lead to a logical extreme wherein every interested firm vying for an A-E contract with the COE will simply flood the process with a sea of excess resumes to ensure itself an advantage in the process. Pl's. Reply 9-10. While the plaintiff might be right that such a scenario would be difficult for the government to manage, the difficulty to the government in not setting a limit has nothing to do with the fact that one was not set here, and this court does not find that the COE has acted irrationally in deciding not to do so. It is in the

government's discretion to set or not set such a limit.  In determining the best value for the

government, the agency is provided great deference to choose between interested firms, so

long as their selection methods are not arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law.  5 U.S.C. § 706(2)(A) (2006).

However, to the extent the plaintiff was confused with respect to the terms of the

evaluation criteria, the plaintiff needed to raise this objection earlier, prior to the

evaluation of the candidate firms' qualification statements.  See Blue & Gold Fleet, 492

F.3d at 1313 (citing Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375,

1381 (Fed. Cir. 2000)) ("Where a government solicitation contains a patent ambiguity, the

government contractor has a duty to seek clarification from the government, and its failure

to do so precludes acceptance of its interpretation in a subsequent action against the

government.") (internal quotation omitted).

Finally, this court notes that the plaintiff itself exceeded the number of resumes

listed in the synopsis.  In such circumstances, the plaintiff cannot claim prejudice, because

it was not subject to disparate treatment.  See Al Andalus Gen. Contracts Co. v. United

States, 86 Fed. Cl. 252, 268 (2009) (finding that the government was deemed to have

waived a fifty-page limitation under FAR 52.215-1(f)(3) (2008) (allowing the government

to "waive informalities and minor irregularities in proposals received"), where every

candidate firm with a submission that exceeded the prescribed limitation was considered).

The plaintiff states that it "provided the exact number of resumes required for each

position."  Pl.'s Mot. 18.  However, upon careful review of the administrative record, the

court finds that the plaintiff's own SF 330, while providing the number of resumes

required for each position required by the synopsis, also included an additional resume for

* * * *  a position that was not required by the synopsis at all.  AR 1447. * * * * Thus,

Weston has failed to show that it was prejudiced by the COE's decision to consider

submissions that included additional resumes beyond the number that the COE listed for

each staff position.

> **3.  The selection board's decision to use an overall adjectival rating for each firm rather than rate each criterion individually is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law**.

The plaintiff argues that the COE's selection process was not in compliance with

federal procurement law because it did not evaluate and compare each announced

selection criterion individually using a rating method.  Pl.'s Mot. 17-18.  The plaintiff

argues that the COE's internal guidance, which provides that a "board can use any

qualitative method, such adjectival or color coding, to evaluate and compare the

qualifications of the firms relevant to each selection criterion," EP 715-1-7 ¶ 3-8(d),

should be read with FAR 36.6 to show that not only must the COE consider each of the

criteria under FAR 36.602-1, but that it must also evaluate each such criterion using some

type of rating method.  The plaintiff contends that absent knowing the underlying ratings

that were assigned to the component parts that made up a ranking, there is no way for a

reviewing court to determine whether there is a rational basis for the selection board's

conclusion on the final overall ranking of a firm.  See Pl.'s Mot. 27 (analogizing the final

rating to a numerical score comprised of four unknown numerical criteria scores and arguing that a reviewing court would be unable to know whether the arithmetic was conducted properly to reach the final numerical score without knowing the underlying numerical scores); Pl.'s Reply 8.

The defendant argues that the language of EP 715-1-7 ¶ 3-8(d), which also prohibits numerical scoring, EP 715-1-7 ¶ 3-8(d) n.11, provides the agency with broad discretion to determine what type of qualitative method to use, so long as it is applied fully and equally to each candidate firm.  The defendant argues that the one type of rating that the regulatory guidance does not permit is the type of formulaic numerical scoring the plaintiff suggests. Def.'s Reply 6.  Moreover, the defendant argues that there was nothing inherently prejudicial about the selection process because all of the firms were evaluated using the same process in compliance with agency protocol laid out in Engineering Pamphlet EP 715-1-7, Architect-Engineer Contracting, in which each individual board member evaluated each firm against the announced criteria before coming to a final consensus ranking.  Def.'s Mot. 22-23; see also AR 1657.

This court's role is limited to determining whether, taking the record as a whole, the decision was rational and supported.  Ryder Move Mgmt, Inc. v. United States, 48 Fed. Cl. 380, 389 (2001).  Here, when the record is examined as a whole, and in particular the narrative rationale, it shows that while the selection board chose only to provide overall adjectival ratings for each firm, it did in fact evaluate each separate primary selection criteria for each candidate firm. See Florida Power & Light Co. v. Lorion, 470 U.S. 729,

744 (1985) (holding that challenges to an agency's procurement decision should be sustained if, <u>inter alia</u>, the "agency has not considered all relevant factors"). The underlying narrative rationale reported for each criterion for each firm demonstrated that the selection board had evaluated and distinguished [Firm C] and Weston under all of the primary selection criteria.  <u>See</u> <u>DeTekion Security Systems</u>, B-298235, et al., 2006 CPD ¶ 130 at 7 (Comp. Gen. July 31, 2006) ("Source selection officials have broad discretion in determining the manner and extent to which they will make use of, not only the adjectival ratings . . . but also the written narrative justification underlying those technical results, subject only to the tests of rationality and consistency with the evaluation criteria.").

As explained earlier, the selection board report described the basis for each ranking, with the rationale broken down for each of the primary selection criteria. * * * *  The narrative corresponds with the comprehensive evaluations of each firm's submitted materials performed by each selection board member.  <u>Compare</u> AR 1692-1857 <u>with</u> AR 1884-2039, 2066-2222.  The interview worksheets filled out by each selection board member during the April 22 interviews with the highly qualified firms also demonstrates evaluation of each of the selection criteria.  <u>Compare</u> AR 1666-91 <u>with</u> 1858-83, 2040-65.

As these narratives show, the selection board did in fact evaluate each firm with respect to each of the primary selection criteria, and, * * * *, the evaluations of [Firm C] and Weston were not the same.  This court cannot say that the differences noted were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law simply because the selection board did not assign an adjectival rating to each selection

criterion.[7]  However, as explained <u>infra</u> Part II.B.4., this court also cannot say that the differences noted demonstrate that Weston and [Firm C] were not rated as technically equal prior to the final ranking decision, thereby triggering the necessary evaluation of the "tie-breaker" criteria.

### 4.   The selection board report is too ambiguous to determine whether the plaintiff ranked fourth or whether the board needed to consider the "tie-breaker" criteria.

Finally, the plaintiff argues that the selection board failed to provide an explanation for ranking the plaintiff below the third place firm despite apparently assigning the plaintiff a higher rating than that firm, thereby demonstrating that the COE's ranking decision lacked a rational basis.  Pl.'s Mot. 16-17.  The plaintiff contends that the description of the final ratings in the written narrative indicates that Weston, (was) * * * * overall rated higher than [Firm C] * * * * .  <u>See</u> AR 1661-62 (emphasis added). Alternatively, the plaintiff argues that if these rating descriptions are in error, the final rating sheet is ambiguous and might be read as giving [Firm C] the same ratings as

---

[7] The plaintiff also relies upon the information it contends was communicated to it in the debriefing with the COE that the evaluation process "focuses, almost exclusively, on a tenuous analysis of the professional qualifications furnished under" criterion (A).  Pl.'s Mot. 26.  The debriefing, however, is not the best evidence of the COE's official evaluation of the unsuccessful offerors' submittals.  <u>See</u> <u>Kerr Contractors, Inc. v. United States</u>, 89 Fed. Cl. 312, 326 (2009) ("debriefing letters . . . are not the best evidence of the Corps' official evaluation of the unsuccessful offerors' revised proposals") (citing <u>Femme Comp Inc. v. United States</u>, 83 Fed. Cl. 704, 732 n.18 (2008) (reviewing the government's proposal evaluation reports rather than its debriefing slides for possible errors in a technical evaluation); <u>Rig Masters, Inc. v. United States</u>, 70 Fed. Cl. 413, 424 (2006) (reviewing the record of a proposal's evaluation by the government, rather than focusing on conflicting evidence of the information communicated in a debriefing)). Examining the record as a whole, it is clear that the selection board evaluated each of the selection criteria.

Weston.  Under this argument, the plaintiff contends that it was rated as technically equal with [Firm C] after the interview phase and that the final three "tie-breaker" criteria should have been evaluated for those two firms.[8] The plaintiff contends that if the "tie-breaker" criteria were evaluated then it would have a substantial chance to be ranked third, ahead of [Firm C], and be in a better position to negotiate an A-E HTRW services contract with the COE.

The defendant concedes that the written narrative appears to describe Weston as rated higher than [Firm C].  Def.'s Mot. 13; see AR 1661-62.  The defendant contends the written description for [Firm C]'s rating was in error as evidenced by the final ratings score sheet labeled "Final" which it reads as rating [Firm C] technically superior to Weston.

As described above, the final score sheet included ratings from each board member and included two ratings of "Excellent -" and a third rating of "Good +" for Weston and two ratings of "Excellent -" and a third rating with an arrow pointing from "Good +" to "Excellent -" for [Firm C], as follows:

---

[8] At oral argument on October 4, 2010, when asked by the court about its views on injunctive relief with respect to evaluation of the tie-breaker criteria and whether the COE could talk to the top-ranked firms, counsel for the plaintiff replied, "I think they would look at the tie criteria as it applies to [Firm C] and Weston because we don't certainly contend that there was a tie . . . with [Firm A] or [Firm B]."  The court further inquired, "So you think negotiations with [Firm A] and [Firm B] could begin?" to which counsel for the plaintiff replied, "They could begin."  In other words, if the "tie-breaker" criteria were to be used to determine the third-ranked firm, then negotiations could proceed with the top two ranked firms without prejudice to the plaintiff.

| Board Member | [Member 1] | [Member 2] | [Member 3] |
|---|---|---|---|
| [Firm C] | Excellent - | Excellent - | Good + → |
| WESTON | Good + | Excellent - | Excellent - |

AR 1654.  It is this third rating of [Firm C] that makes all the difference.

The court agrees with the plaintiff that the final ratings sheet is ambiguous with respect to whether [Firm C] received a third score in the upper range of "Good" or in the low range of "Excellent" on the basis of an arrow pointing from "Good +" to "Excellent -." The selection board's intended meaning for the arrow is only further confused by the selection board report's narrative.  In the narrative, the written descriptions of the ratings for [Firm A], Weston, [Firm E], and [Firm F] exactly tracked the final score sheet. Compare AR 1654 with AR 1660, 1662, 1663, 1664.  However, the written description for [Firm C], * * * * did not track the final rating * * * * .  As explained above, this court's role is limited to determining whether, taking the record as a whole, the decision was rational and supported.  Ryder Move Mgmt., 48 Fed. Cl. at 389.  The propriety of an agency's decision to rank one firm as technically higher than another turns "on whether the contracting agency's judgment concerning the significance of that difference was reasonable in light of the solicitation's evaluation scheme.  In this regard, adjectival ratings . . . are but guides to, and not substitutes for, intelligent decisionmaking." DeTekion Security Systems, 2006 CPD ¶ 130 at 7.  Here, when the record is examined as a whole, and in particular after careful review of the final ratings score sheet and the written descriptions in the narrative rationale, there is no explanation  provided for this

discrepancy.  While, the standard of review does not charge this court with holding the COE to a mistake-free analysis, this court cannot determine whether the COE provided a "coherent and reasonable explanation of its exercise of discretion" where none is given. Axiom Res. Mgmt., 564 F.3d at 1381.

Clarification of [Firm C]'s final rating is important, because if [Firm C] was rated as technically equal with Weston after the interview phase of the selection process, then criteria (E)-(G), the "tie-breaker" criteria, should have been evaluated.  AR 18.  After such an evaluation, the plaintiff may ultimately be ranked third, ahead of [Firm C], and be in a better position to negotiate an A-E HTRW services contract with the COE.  Therefore, the court concludes that the plaintiff was prejudiced by the selection board's failure to articulate a coherent and reasonable explanation of its final ratings prior to ranking [Firm C] third and the plaintiff fourth.

## III.   REMEDY

The court has considerable discretion in determining whether to award injunctive relief in a bid protest.  See 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."); see also PGBA, 389 F.3d at 1226 (acknowledging the court's "equitable discretion in deciding whether injunctive relief is appropriate").  In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable

harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  PGBA, 389 F.3d at 1228-29.

The plaintiff has satisfied the first criterion by demonstrating that it was prejudiced by the selection board's failure to articulate a coherent and reasonable explanation of its final ratings prior to ranking [Firm C] third and the plaintiff fourth.

Under the second criterion, the plaintiff contends that if an injunction is not issued, then the plaintiff will be denied "the benefit of a legally valid procurement process that involves a fair consideration of its qualifications, and a fair and reasonable comparison of its qualifications to those submitted" by [Firm C], and it will be denied the opportunity to be one spot closer in line to negotiating for up to three A-E HTRW services contracts with the COE.  Pl.'s Mot. 37.  The court agrees.

Regarding the third criterion, the defendant argues that because Weston would not be assured of receiving a contract even if injunctive relief is ordered, the balance of harm of delaying contract negotiations favors maintaining the status quo.  Def.'s Mot. 29.  The plaintiff has conceded that the negotiations with the top two ranked firms could proceed while the COE reconsiders and clarifies the ratings and rankings of [Firm C] and Weston.  See supra Part II.B.4. n.9.  As the A-E procurement regulations require that the COE begin negotiations with the top-ranked firm and proceed to each lesser ranked firm only after completing negotiations with the firms ranked above, the court finds that any potential delay to the negotiation process while the COE reconsiders and clarifies the ratings and

rankings of [Firm C] and Weston will be minimal.  On balance, the court finds that the hardships to the plaintiff of not issuing an injunction exceed the harm to the defendant of enjoining the COE from engaging in negotiations with [Firm C] until the COE reconsiders and clarifies the ratings and rankings of [Firm C] and Weston.

In considering the public interest, the harm to [Firm C] of any potential delay should also be considered.  While the public interest is no doubt always served by avoiding needless delay, here the court finds that some delay is needed in order to ensure that an accurate ranking decision is made and therefore it is in the public interest to enjoin the COE from engaging in negotiations with [Firm C] until the COE on remand reconsiders and clarifies the ratings and rankings of [Firm C] and Weston.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiff's motion for judgment on the administrative record is **GRANTED-IN-PART** and the government's cross motion for judgment on the administrative record is **DENIED**.

The court hereby **ORDERS** the decision regarding the relative rankings of Weston and [Firm C] **REMANDED** to the District of Alaska COE to review and clarify its ratings with regard to [Firm C] and Weston and then determine on the record their relative rankings.  As discussed above, the purpose of this review is only to clarify the record and the ambiguity created by the "arrow" pointing to a certain rating for [Firm C] and the description of the [Firm C] rating in the selection board report. However, if upon review the COE determines that the ratings for Weston and [Firm C] are the same, then the COE

shall apply the "tie-breaker" criteria as described in the synopsis.  The government will provide the court with a supplement to the administrative record containing the final ranking of [Firm C] and Weston by **November 15, 2010**.

During this limited remand to the COE, the COE may engage in negotiations with the two top ranked firms, [Firm A] and [Firm B].  The COE may not engage in negotiations with any other of the highly ranked firms, including [Firm C] and Weston, until further order of the court.

Entry of the judgment is deferred pending resolution of the equitable relief described above.[9]

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[9] This remand shall be carried out in accordance with Rule 52.2 of the Rules of the Court of Federal Claims.